## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No.:

HANNAH WEIKERT
JENNIFER HERMANNS
TERRENCE LACEY
SEAN NELSON
JEAN-JOSEPH LE CHIFFRE
GILBERT TRUJILLO

      Plaintiffs, on their own and on behalf of a class of similarly situated persons,

v.

BILL ELDER, Sheriff of El Paso County, Colorado, in his official capacity,

      Defendant.

---

## CLASS ACTION COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF

---

      Plaintiffs Hannah Weikert, Jennifer Hermanns, Terrence Lacey, Sean Nelson, Jean-Joseph Le Chiffre, and Gilbert Trujillo, on their own and on behalf of a class of similarly situated persons, by and through their attorneys, bring this Complaint for Injunctive and Declaratory Relief against El Paso County Sheriff Bill Elder in his official capacity, and state as follows in support:

### INTRODUCTION

**"We're just going to let the virus run its course."**

1.      While COVID-19 is spreading like wildfire in Defendant's jail and ravishing the population gripped by fear and suffering, jail staff have told people incarcerated there begging for help: "we're just going to let the virus run its course."

2.      This callous statement sums up the policy of the El Paso County Sheriff's Office (EPSO) regarding the novel coronavirus ("COVID-19" or "virus"). Rather than fulfill his

constitutional duty to protect and care for those detained in the jail through mask provision and enforcement, intake and separation protocols, careful monitoring and treatment, and other proven measures, Defendant Elder and the EPSO have chosen to let COVID-19 "run its course" and have its way with this highly-vulnerable population.

3.      Disaster has resulted. While communities across America buckled down on strict mask compliance and isolation protocols over the summer and fall of 2020—especially in crowded residential settings like jails—the El Paso County Criminal Justice Center (CJC or "jail") failed to require or even distribute masks to all inmates. When fearful people requested masks or created their own improvised face coverings, jail staff ***prohibited*** inmates from wearing masks or covering their faces for protection. Meanwhile, the jail freely mixed those positive or suspected positive of COVID-19 with those who were negative, while also comingling new intakes coming into the jail with the established population.

4.      Infection blossomed in these fertile viral conditions. By October, the jail found itself in the midst of a massive outbreak so out of control that Defendant called the National Guard for assistance testing the population.

5.      It was too little, too late. The virus is spreading at will in these disorderly, mismanaged conditions. By November 8, the jail's website confirmed that at least 859 inmates in the jail, out of a population of approximately 1,200, had tested positive for the coronavirus, with 73 staff members testing positive on November 9. It is one of the largest outbreaks in Colorado during the pandemic, and an outlier compared to other Colorado jails with lesser rates of infection: according to the Colorado Department of Public Health and Environment, as of today,

the jail remains in the throes of an outbreak, with 1010 inmates infected, and 106 staff members infected.[1]

6.     Multiple Plaintiffs and hundreds of class members contracted COVID-19 in the jail, suffering unnecessarily as a result of Defendant's deliberately indifferent failure to protect them from the obvious risk of infection and the consequent harm to their health. Meanwhile, Plaintiffs and class members yet to contract the virus have lived in perpetual fear it will soon infect them, as they look around at sick bunkmates and coughing jail staff, and observe the widespread lack of mask compliance and disorder in the facility.

7.     In the time it took counsel for Plaintiffs to prepare this filing, some inmates who had tested negative multiple times have by now tested positive and begun to get sick. The conflagration of illness and mismanagement continues, requiring this Court's urgent intervention. Symptomatic Plaintiffs and proposed class members suffer the range of debilitating COVID-19 symptoms, including chest pain, chest tightness, difficulty breathing, shortness of breath, persistent coughs, fevers, sleep problems, nausea and vomiting, diarrhea, and myriad other symptoms. Inmates experience unrelenting fear and stress over the jail's failure to protect them from contracting the virus, and related failure to adequately monitor and treat them when they do contract it.

8.     Despite this mammoth, preventable outbreak, Defendant Elder continues to fail to meet his constitutional obligations in two overarching respects discussed in greater detail herein: (1) he is failing to implement adequate protective measures to prevent the spread of COVID-19,

---

[1] Colorado Department of Public Health, *COVID OB Weekly Report 12 2 2020* (last checked December 13, 2020), https://drive.google.com/file/d/1UQtl20evO-R1YNGqVgqZCSgM7Fgh_TU_/view.

and (2) he is failing to ensure adequate evaluation, monitoring, and treatment of symptomatic inmates confirmed or suspected positive for COVID-19.

9.     As a result of Defendant Elder's constitutionally-deficient practices and policies, Plaintiffs and class members are subjected to an unjustifiable risk of substantial harm to their health and even to their lives. Plaintiffs, on behalf of themselves and all current and future detainees and prisoners in the jail, seek prospective relief to protect their health, their lives, and their state and federal constitutional rights.

## I.     JURISDICTION AND VENUE

10.     Plaintiffs bring this class action pursuant to 42 U.S.C. § 1983 and C.R.S. § 13-21-131 for relief from conditions of confinement that violate their rights under the Eighth and Fourteenth Amendments and Article II Sections 20 and 25 of the Colorado Constitution.

11.     This Court has subject matter jurisdiction over the federal claims pursuant to 28 U.S.C. § 1331. The Court has supplemental jurisdiction over the state claims pursuant to 28 U.S.C. § 1367.

12.     Venue is proper pursuant to 28 U.S.C. § 1391(b)(2) because the Defendant resides in this district and a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this district.

## II.     PARTIES

13.     Plaintiff Hannah Weikert is detained pretrial in the jail. She is unable to pay a financial condition of bond. Ms. Weikert is 23 years old and 13-weeks pregnant. She has a body mass index approximately between 38.9 and 41. She is also a smoker and suffers from severe asthma. She has been hospitalized for asthma several times in the past. She is prescribed a steroid to take daily and nebulizer to use daily for her asthma, and she has an emergency inhaler at

4

home. She is not receiving her steroid, nebulizer, or inhaler while in the jail. As a result of Ms. Weikert's pregnancy and medical conditions, Ms. Weikert is particularly vulnerable to suffering severe and devastating effects from COVID-19.

14.     Plaintiff Jennifer Hermanns is in custody for an alleged violation of probation. Ms. Hermanns is 41 years old and suffers from moderate asthma.  She has been hospitalized in the past as a result of her asthma, and she is prescribed inhalers for it. Ms. Hermanns also has a condition called chronic granulomatous disease (CGD), which makes it difficult for her body to fight infections. Additionally, Ms. Hermanns has breast cancer and is a smoker. As a result of her medical conditions, Ms. Hermanns is particularly vulnerable to suffering severe and devastating effects from COVID-19.

15.     Plaintiff Terrance Lacey is 59 years old and turned himself in on a warrant to the jail in September of 2020. Mr. Lacey is being detained pretrial awaiting extradition. Mr. Lacey has lung cancer, chronic obstructive pulmonary disease (COPD), and severe asthma and has received inconsistent medical treatment for his pulmonary conditions. He requires the use of two inhalers to manage his COPD and asthma. As a result of his underlying medical conditions and his age, Mr. Lacey is particularly vulnerable to suffering severe and devastating effects from COVID-19.

16.     Plaintiff Sean Nelson is 38 years old and detained pretrial in the jail. Mr. Nelson suffers from advanced cell lung cancer and early signs of congestive heart failure. As a result of Mr. Nelson's medical conditions, he is particularly vulnerable to suffering severe effects from COVID-19.

17.     Plaintiff Jean-Joseph Le Chiffre is detained pretrial in the jail. He is 55 years old and has type 2 diabetes mellitus and hypertension. Mr. Le Chiffre has experienced splitting

headaches, body aches, a fever, and other symptoms while he shared a cell with a symptomatic detainee. Because Mr. Le Chiffre has been denied his medical records and test results, he does not know whether he has contracted the virus that causes COVID-19. As a result of his underlying medical conditions and his age, Mr. Le Chiffre is especially vulnerable to severe illness from the virus.

18.    Plaintiff Gilbert Trujillo is detained in the El Paso County Jail on a parole hold. Mr. Trujillo is 29 years old and has Hepatitis C.  He entered the jail on November 26, 2020, and is afraid that he will contract COVID-19 while in the jail.  He has been moved around to several wards of the jail and has been in contact with people experiencing COVID-19 symptoms.

19.    All plaintiffs have fully exhausted all administrative remedies available to them.

20.    Defendant Bill Elder is the Sheriff of El Paso County. He is responsible for all policies and practices of the El Paso County Sheriff's Office (EPSO), including all policies and practices of the El Paso County Jail, which is known as the Criminal Justice Center. Sheriff Elder has ultimate supervisory responsibility for employees and deputies who work at the El Paso County Sheriff's Office, including those who work at the jail. All of Defendant Elder's actions and inactions described herein occurred under color of state law. Defendant Elder is sued in his official capacity for declaratory and injunctive relief.

### III.         FACTUAL ALLEGATIONS

**A.  Failure to Prevent and Treat COVID-19 Poses a Significant Risk of Illness, Injury, or Death**

21.    The virus that causes COVID-19 spreads from person to person through respiratory droplets and aerosolized particles produced when an infected person speaks, coughs, sneezes,

sings, or breathes, and another person inhales the droplets and becomes infected.[2] Close personal contact, often within about 6 feet, is one way it commonly spreads.[3] Smaller aerosol particles can also travel further than 6 feet and remain suspended in the air for hours.[4] The virus may also spread through fecal matter, and from contact with contaminated surfaces and objects, when infected droplets are touched by a person, and that person then touches their own mouth, nose, or eyes.[5] Scrupulous mask-wearing, adequate physical distancing, and a vigilant hygiene regimen, including washing hands frequently and thoroughly with soap and water, reduce the spread of the virus.

22.     Because the coronavirus also spreads from and among presymptomatic and asymptomatic carriers (who do not show symptoms),[6] strict compliance with mask-wearing, distancing, and isolation protocols is required across the board, for everyone, in order to prevent spread in congregate settings like the jail.[7]

23.     Once contracted, COVID-19 can cause symptoms that lead to substantial pain and suffering, including fever, chills, coughing, shortness of breath, difficulty breathing, fatigue, aches, headaches, chest pain, loss of taste and smell, sore throat, vomiting, diarrhea, confusion, neurological impairment, and other symptoms.[8]

---

[2] Centers for Disease Control and Prevention (CDC), *How Does the Virus Spread?* (Dec. 2, 2020), https://www.cdc.gov/coronavirus/2019-ncov/faq.html.

[3] *Id.*

[4] *Id.*

[5] *Id.*

[6] CDC, *Interim Clinical Guidance for Management of Patients with Confirmed Coronavirus Disease (COVID-19)* (updated Dec. 8, 2020), https://www.cdc.gov/coronavirus/2019-ncov/hcp/clinical-guidance-management-patients.html.

[7] CDC, *How COVID-19 Spreads* (Oct. 28, 2020), https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/how-covid-spreads.html.

[8] CDC, *Symptoms of Coronavirus*, https://www.cdc.gov/coronavirus/2019-ncov/symptoms-testing/symptoms.html.

24.     The virus can also lead to death from a variety of complications, and at least fifteen people have died in Colorado prisons during the pandemic, including four recent deaths in the span of 24 hours, and four deaths during the preparation of this filing.[9] Colorado has also seen multiple deaths arising from COVID-19 cases in jails.[10] Nationally, there have been at least 1,657 deaths of people in jails and prisons, although this number underrepresents the true tally because many jails and detention centers do not report this data.[11]

25.     COVID-19 complications can manifest at an alarming pace, as can the spread of an outbreak inside a jail. Patients can show the first symptoms of infection in as little as two days after exposure, and their condition can seriously deteriorate in as little as five days or sooner.[12] Even some younger and healthier people who contract COVID-19 may require supportive care,

---

[9] *4 more Colorado inmates die of COVID-19 over the last week*, 9News (Dec. 1, 2020), https://www.9news.com/article/news/health/coronavirus/cdc-covid-19-colorado-corrections-cdoc/73-3fce64c2-e450-4138-9cce-825d99f9785d; *CDOC COVID Dashboard and Updates* (updated Dec. 11, 2020), https://www.colorado.gov/pacific/cdoc/covid-19-faq-and-updates.

[10] Though the data are not tracked accurately, including those who contracted COVID-19 in jail and died after release, there are at least three deaths believed to be related to COVID-19 in Colorado jails. *See, e.g.,* Conor McCormick-Cavanagh, *Man Released from Weld County Jail Died of COVID-19 Two Days Later*, Westword (May 1, 2020), https://www.westword.com/news/weld-county-jail-detainee-died-of-covid-19-sheriff-sued-11702172; Conor McCormick-Cavanagh, *Detainee Death in Weld County Jail Possibly COVID-Related ,* Westword (May 20, 2020), https://www.westword.com/news/covid-positive-weld-county-jail-detainee-dies-11714258; Elise Schmelzer, *Man dies of coronavirus 4 days after bonding out of Jefferson County jail custody*, Denver Post (May 17, 2020), https://www.denverpost.com/2020/05/14/colorado-coronavirus-jail-death-jefferson-county/#:~:text=PUBLISHED%3A%20May%2014%2C%202020%20at,to%20die%20days%20after%20release.&text=The%20man%2C%20who%20tested%20positive,after%20bonding%20out%2C%20Taplin%20said.

[11] The Marshall Project, *A State-by State Look at Coronavirus in Prisons* (updated Dec 11. 2020), https://www.themarshallproject.org/2020/05/01/a-state-by-state-look-at-coronavirus-in-prisons#prisoner-deaths.

[12] CDC, *Interim Clinical Guidance*, *supra* note 6.

which includes supplemental oxygen, positive pressure ventilation, and in extreme cases, extracorporeal mechanical oxygenation.

26.     Patients who do not die from serious cases of COVID-19 may face prolonged recovery periods and potentially permanent injury, including: loss of respiratory capacity, cardiovascular damage, acute renal injury, and other long-term and permanent conditions;[13] neurological injury such as sleep issues, difficulty concentrating, memory problems, loss of taste and smell, and other neurological injury; and, psychiatric injury including depression, anxiety, and mood changes.[14]

27.     Even people with asymptomatic cases of COVID-19 and who do not themselves notice any symptoms may be suffering long-term adverse effects from the virus, including lung damage, myocardial damage, and other injury.[15]

28.     Therefore, although older and medically vulnerable people face higher risk, no one is safe from these risks of death, serious illness, and long-term and potentially permanent injury from the virus. For instance, 41-year-old El Paso County Deputy Jeff Hopkins died of COVID-19

---

[13] CDC, *Long-Term Effects of COVID-19*,  https://www.cdc.gov/coronavirus/2019-ncov/long-term-effects.html.

[14] *Id.*

[15] *What is causing long-term lung damage in asymptomatic COVID-19 cases?*, CGTN (Oct. 28 2020), https://newseu.cgtn.com/news/2020-10-28/What-is-causing-long-term-lung-damage-in-asymptomatic-COVID-19-cases--UW4EfTLyYo/index.html; *Long-term symptoms, complications of COVID-19,* Mayo Clinic (Aug. 3 2020), https://newsnetwork.mayoclinic.org/discussion/long-term-symptoms-complications-of-covid-19/; Laura Cella et al, *Injuries from Asymptomatic COVID-19 Disease: New Hidden Toxicity Risk Factors in Thoracic Radiation Therapy*, Int. J. RAdiat. Oncol. Biol. Phys. (Oct. 1 2020), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7462877/.

on April 1, 2020. He had worked in the intake unit of the jail and the death investigation concluded he contracted the virus in the jail while working in that capacity.[16]

29.    Clinical data show that people can be reinfected with COVID-19.[17] Contracting the virus once does not mean that individual is protected from future infections. People have survived an initial infection, only to be killed by a later reinfection by COVID-19.[18] Therefore, the same protective measures must be followed by everyone—those who have previously contracted the virus, and those who have not.

**B.  Failure to Prevent and Treat COVID-19 in Populous Jails Creates a Grave and Immediate Danger**

30.    People in congregate environments like the jail, where a large population of people live, eat, and sleep in close proximity, face increased danger of contracting COVID-19, as already evidenced by the rapid spread of the virus in jails[19] and prisons[20] in Colorado and across the nation.

---

[16] *El Paso Co. Deputy Jeff Hopkins passing determined to be in the line of duty*, KOAA (Apr. 14, 2020), https://www.koaa.com/news/covering-colorado/el-paso-co-deputy-jeff-hopkins-passing-determined-to-be-line-of-duty-death.

[17] *See, e.g.,* CDC, *Reinfection with COVID-19* (updated Oct. 27. 2020), https://www.cdc.gov/coronavirus/2019-ncov/your-health/reinfection.html; Livia Pimenta Bonifacio, *Are SARS-CoV2 reinfection and Covid-19 recurrence possible?,* PMC (Sept 28, 2020), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7508196/; *COVID-19 Case in Weber County jail may be a case of reinfection*, (Oct 13. 2020), https://kutv.com/news/coronavirus/covid-19-case-at-weber-county-jail-may-be-a-case-of-reinfection.

[18] *Woman who died after catching COVID-19 twice*, CBS News (Oct. 14 2020), https://www.cbsnews.com/news/covid-twice-death-dutch-woman/; *More people are getting COVID-19 twice, suggesting immunity wanes quickly in some*, Science (Nov 18. 2020), https://www.sciencemag.org/news/2020/11/more-people-are-getting-covid-19-twice-suggesting-immunity-wanes-quickly-some.

[19] *Judge Rules Against Weld County in Coronavirus Jail Dispute*, USA News (May 12, 2020), https://www.usnews.com/news/best-states/colorado/articles/2020-05-12/judge-rules-against-weld-county-in-coronavirus-jail-dispute.

[20] Large outbreaks have occurred at Colorado prisons with thousands of cases and fifteen deaths so far. *See CDOC COVID Dashboard and Updates* (updated Dec. 11, 2020), https://www.colorado.gov/pacific/cdoc/covid-19-faq-and-updates.

Some of the largest outbreaks in the country are linked to carceral facilities.[21] Both the infection rate, as well as the death rate, are higher for people incarcerated.[22]

31.     From the beginning of the pandemic, it has been well-known that if proper precautions are not taken, jails can become ideal incubators for COVID-19 because they house large groups of people together, often move people in groups, often move people within the facilities, and because new intakes continually enter the facilities.[23] They frequently have insufficient medical care for the population even outside times of crisis.[24]

32.     Notably, failure to prevent and mitigate COVID-19 outbreaks in jails and prisons also exacerbates spread of the virus into surrounding communities, jeopardizing the general public's health and safety as well.[25]

**C.  Defendant Elder Knew COVID-19 Is a Highly-Contagious Virus Posing a Grave Danger to People In the Jail**

33.     Like anyone living through it, since the inception of the pandemic in March of 2020, Defendant Elder has been keenly aware of the grave danger COVID-19 poses, particularly in his jail, as alleged herein.

34.     Put simply, Defendant Elder and his agents knew that it would be a "nightmare" outbreak scenario if the virus entered the jail and proper precautions were not in place to minimize

---

[21] COVID-19's Impact on People in Prison, Equal Justice Initiative (August 21, 2020), https://eji.org/news/covid-19s-impact-on-people-in-prison/#:~:text=Incarcerated%20people%20are%20infected%20by,(29%20deaths%20per%2010 0%2C000).

[22] *Id.*

[23] *See, e.g,* Nathalie Baptiste, *Correctional Facilities are the Perfect Incubators for the Coronavirus*, (March 6, 2020).

[24] *See, e.g.*, Bill Coll, *The Jail Health-Care Crisis*, The New Yorker (Feb. 25, 2019).

[25] *How COVID-19 in Jails and Prisons Threatens Nearby Communities,* Pew (July 1, 2020), https://www.pewtrusts.org/en/research-and-analysis/blogs/stateline/2020/07/01/how-covid-19-in-jails-and-prisons-threatens-nearby-communities.

spread and treat the ill. He knew staff and inmates were likely to become infected and would in turn certainly spread infection throughout the populous facility, if he failed to implement appropriate precautions. He knew COVID-19 had already found its way into the facility with deadly results, killing one of his own deputies in April. Given the size of the jail and the quantity of staff and people leaving and entering the facility, he also knew that additional exposures to COVID-19 were inevitable, making precautions all the more critical.

35.     Sheriff Elder was aware of public health orders, orders from Governor Polis, and CDC and public health guidance on the importance of COVID-19 protocols in the jail. Sheriff Elder was also specifically informed about the risks of COVID-19 in jails, and the importance of following CDC protocols, by letters sent to him from the ACLU on March 26, 2020,[26] and June 23, 2020.[27] He was even provided Chief Judge Brimmer's preliminary injunction order from *Carranza v. Reams* on June 23, further instructing him of the importance of complying with CDC guidelines. No. 20-CV-00977-PAB, 2020 WL 2320174, at *15 (D. Colo. May 11, 2020) (granting in part preliminary injunction relating to an outbreak in the Weld County jail).

**D.  Defendant Elder Acted with Deliberate Indifference By Failing to Provide Masks**

36.     The massive outbreak that has erupted in the jail was preventable, and the continuing spread of the virus is preventable. While myriad deficiencies caused the outbreak and continue to expose Plaintiffs and class members as alleged herein, the jail's lack of a mask policy illustrates most vividly Defendant's deliberate indifference. To the shock of the public long-

---

[26] Letter To Colorado Sheriffs Regarding COVID-19, ACLU OF COLORADO (March 26, 2020), available at: https://acluco-wpengine.netdna-ssl.com/wp-content/uploads/2020/03/COVID-19-Sheriff-Letter-3-26-2020.pdf.

[27] Letter To Colorado Sheriffs Regarding COVID-19, ACLU OF COLORADO (June 23, 2020), available at https://acluco-wpengine.netdna-ssl.com/wp-content/uploads/2020/03/2020-06-23-Sheriffs-ACLU.pdf.

accustomed to wearing masks, it emerged in media reports that it was not until late October and early November of 2020—when more than two-thirds of the inmate population had tested positive, that the jail finally decided to provide masks to inmates. Until then, it had perversely ***prohibited*** inmates from wearing protective masks in their housing wards.[28]

37.      Defendant Elder had failed over a period of months and months to provide masks to inmates in their wards despite knowing masks are a simple, cheap, and effective way to prevent spread of the virus. Inmates who were being transported to court got masks during transport, but they were required to discard those masks before returning to their housing units. Inmates who made masks for themselves out of sheets or underwear risked disciplinary infractions.

38.      Abundant public information confirms the critical importance of masks. By April 3, 2020, Centers for Disease Control and Prevention (CDC) guidance instructed that masks should be worn by everyone in order to reduce the spread of the virus.[29] By May 5, 2020, El Paso County issued public health guidance regarding the importance of wearing a face covering over the nose and mouth to prevent the spread of the virus.[30] On July 16, 2020, Governor Polis issued a statewide

---

[28] Olivia Prentzel et al, *El Paso County jail staff, inmates cite lack of masks in COVID-19 outbreak that became one of the largest in the state*, The Gazette (Nov. 14, 2020 updated Dec. 3, 2020), https://gazette.com/premium/el-paso-county-jail-staff-inmates-cite-lack-of-masks-in-covid-19-outbreak-that/article_b1bec9be-25f9-11eb-9f87-8799f955bbc6.html

[29] *CDC Now Recommends Americans Consider Wearing Cloth Face Coverings in Public*, NPR (Apr. 3 2020), https://www.npr.org/sections/coronavirus-live-updates/2020/04/03/826219824/president-trump-says-cdc-now-recommends-americans-wear-cloth-masks-in-public.

[30] El Paso County Public Health (May 5, 2020), https://www.elpasocountyhealth.org/news/news-release/2020/el-paso-county-public-health-provides-update-to-el-paso-county-board-of.

mask mandate. Defendant Elder that same day acknowledged the importance of mask-wearing in a public statement: "wearing a mask will slow the spread of COVID-19 and save lives."[31]

39.    The next day, July 17, in a video posted to Facebook, Defendant Elder reiterated the importance of masks to stop the virus, and he claimed he had implemented mask mandates: "We follow this [mask] order inside the Sheriff's Office, we have for several months at this point."[32] To illustrate the point on video, Defendant Elder picked up a mask he uses to protect himself and those around him and showed it to viewers:



40.    "Wear a mask," Defendant Elder implored El Paso County citizens in this video.[33] Yet, he and his staff were simultaneously telling Plaintiffs and class members who wanted to protect themselves and each other: "you can't wear a mask."

41.    The Sheriff's representation that he was enforcing the mask order within the Sheriff's office was inaccurate. To the contrary, he was failing to provide masks to inmates in his

---

[31] El Paso County Sheriff's Office Facebook, (post July 16, 2020), https://www.facebook.com/EPCSheriffsOffice/.

[32] *Id.* (post July 17, 2020), *video available at* https://perma.cc/GQ9K-9HZZ.

[33] *Id.*

jail, and he was certainly not requiring their use.  Even more troublingly, the jail forbade inmates from wearing masks in their housing wards.

42.     Sheriff Elder not only knew masks would help stop the virus, he knew it was his job to ensure inmates received constitutionally adequate protection and care. "It's my job to protect the Constitutional rights of every single person in El Paso County," stated Defendant Elder in the above-referenced video, who surely knew this included people incarcerated in his jail.

43.     Defendant Elder failed to provide masks despite being granted $13.6 million in federal funding under the CARES Act for the specific purpose of COVID-19 protection—funds he chose to spend on a variety of expensive projects.[34] While Defendant Elder broke ground on multi-million dollar construction—such as renovating the staff locker room, buying new security cameras, remodeling a training facility, remodeling offices, and buying a "property conveyor" machine—human beings in jail sat helpless and without even a simple cloth mask to protect them from the looming spread of this potentially deadly virus.[35]

44.     Buying simple cloth masks for inmates would have cost a negligible sum. A bulk purchase of 10,000 masks, more than enough to supply the inmates and staff on an ongoing basis, would have cost Defendant Elder no more than $7,800 according to publicly-available suppliers, a tiny fraction of the $13.6 million he was granted in CARES Act funds.[36] Other facilities, including the Colorado Department of Corrections, have even permitted inmates to make masks

---

[34] EPSO Media Release, Sheriff's Office Launches COVID-19 Projects After Receiving Cares Act Funding, (June 16, 2020), https://www.epcsheriffsoffice.com/sites/default/files/news-releases/MR%2020-102%20Sheriff%27s%20Office%20Launches%20COVID-19%20Projects%20After%20Receiving%20Cares%20Act%20Funding.pdf
[35] *Id.*
[36] *See, e.g.,* https://totebagfactory.com/cart.

for use in the facilities.[37] Here, to the contrary, the jail prohibited inmates from crafting their own face coverings.

45. After news of this fall's massive outbreak emerged and reporters asked about the jail's failure to provide masks to inmates, Defendant's public relations agent misleadingly claimed that the jail had a "limited supply" of masks and personal protective equipment (PPE), and suggested masks were "contraband" due to some masks having metal in the nosepiece.[38] This dubious response only confirms that Defendant knowingly failed to use the $13.6 million his office received on masks or other PPE as Congress intended the funds to be used. Further, the nonsensical explanation regarding metal in nosepieces—***when cloth masks without metal had been distributed in jails and prisons nationwide for months***—only highlights Defendant's culpability.[39] The jail itself had allowed limited mask wearing when inmates traveled to court, further demonstrating that they knew masks posed no security risk. Defendant knew very well that cloth masks could be provided to inmates without any security risk, and he had plentiful funds for that purpose.

---

[37] Elise Schmelzer, *For less than 1$ an hours, Colorado prisoners are producing thousands of masks per day for use in Colorado prisons,* Denver Post (Apr. 21, 2020), https://www.denverpost.com/2020/04/21/colorado-coronavirus-prisons-masks/.

[38] Olivia Prentzel et al, *El Paso County jail staff, inmates cite lack of masks in COVID-19 outbreak that became one of the largest in the state*, The Gazette (Nov. 14, 2020 updated Dec. 3, 2020), https://gazette.com/premium/el-paso-county-jail-staff-inmates-cite-lack-of-masks-in-covid-19-outbreak-that/article_b1bec9be-25f9-11eb-9f87-8799f955bbc6.html.

[39] *See, e.g.,* Elise Schmelzer, *For less than 1$ an hours, Colorado prisoners are producing thousands of masks per day for use in Colorado prisons,* Denver Post (Apr. 21, 2020), https://www.denverpost.com/2020/04/21/colorado-coronavirus-prisons-masks/; *Prison system to get facemasks amid outbreak*, Health News Florida (May 7, 2020), https://health.wusf.usf.edu/health-news-florida/2020-05-07/prison-system-to-get-face-masks-amid-outbreak; *Inmates making face masks*, CBS Philly, (April 7, 2020), https://philadelphia.cbslocal.com/2020/04/07/coronavirus-pa-inmates-face-masks-covid-19/.

46.     Masks are critical COVID-19 prevention for several reasons. First, requiring mask-wearing by everyone in a congregate setting reduces the amount wearers spread the virus by stopping their respiratory droplets from circulating in the air.[40] Combined with other appropriate measures, mandatory masking can stop the spread of COVID-19 in a facility.

47.     Second, a mask protects the wearer in part by reducing the amount of potentially infectious respiratory droplets the wearer breathes in.[41] This reduces the likelihood of transmission and reduces the viral load inhaled, which in equal measure reduces the severity of the illness and increasing the likelihood of asymptomatic infection. Mandatory masking therefore not only stops the spread of the virus, it further reduces the severity and quantity of symptoms experienced by those who become infected. It has been shown mask-wearing reduces infection by 65 percent for the wearer.[42] And masks significantly increase the chances of an infection being asymptomatic, with some studies showing up to 95 percent asymptomatic infection for mask wearers.[43]

---

[40] CDC, *Interim Guidance on Management of Coronavirus Disease (COVID-19) in Correctional and Detention Facilities*, (Oct. 21, 2020), https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html.

[41] Monica Gandhi et al, *Masks Do More than Protect Others During COVID-19: Reducing the Inoculum of SARS-CoV-2 to Protect the Wearer*, Journal of General Internal Medicine (July 31, 2020),  https://link.springer.com/article/10.1007/s11606-020-06067-8; *see also* CDC, Evidence for Effectiveness of Masks, (Nov. 12, 2020) ("A cloth masks also offers some protection to you too."), https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/cloth-face-cover-guidance.html.

[42] *Your Mask Cuts Own Risk by 65 Percent*, UC Davis (July 6, 2020), https://www.ucdavis.edu/coronavirus/news/your-mask-cuts-own-risk-65-percent/.

[43] Nina Bai, *One More Reason to Wear a Mask: You'll Get Less Sick from COVID-19*, UCSF (July 31, 2020), https://www.ucsf.edu/news/2020/07/418181/one-more-reason-wear-mask-youll-get-less-sick-covid-19.

### E. The Jail Continues to Fail to Implement Necessary Precautions and Treatment

#### a. Failure to Provide Masks or Enforce Mask-Wearing

48.     In the aftermath of the massive outbreak in October and November, the jail has still failed to implement basic necessary protocols to keep people safe in the jail. The mask policy, if one exists, remains woefully inadequate.

49.     In late October or early November, after the facility was already in the midst of this enormous outbreak, the jail finally began distributing masks. However, even after that and continuing to the present, the jail has still failed to enforce mask-wearing in the facility. Many inmates do not wear masks, and some have no mask at all for periods of time. There is no apparent mask mandate in the facility, and no enforcement of mask-wearing by inmates or staff.

50.     Moreover, there is no reliable procedure for washing masks in the jail. Masks must be cleaned "at least daily" in order to be effective, and inmates need at least two washable masks at a time so that when one is removed for washing the other can be worn.[44] The jail has not provided two masks to all inmates, leaving them unprotected for periods of time. At times it has required inmates to turn in their masks to be washed by guards overnight—leaving people without protection, and risking contamination by exchanging masks between inmates.

51.     Jail staff also often fail to wear masks or do not wear them properly such that their nose or mouth is left uncovered, defeating the purpose of wearing one. Inmate complaints that staff do not scrupulously wear masks are ignored.

---

[44] CDC, *How to Store and Wash Masks*, (updated Oct. 28, 2020), https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/how-to-wash-cloth-face-coverings.html ("Consider having more than one mask on hand so that you can easily replace a dirty mask with a clean one."); Isabella Simonetti, *Do you really have to wash your mask after every use? Short answer: Yes.,* Vox (Sept. 7, 2020), https://www.vox.com/the-goods/21358558/covid-19-masks-n95-washing-laundry-germs.

### b.   Failure to Separate COVID-19 Positive or Suspected Positive Inmates

52.     The jail fails to strictly separate inmates who test positive for COVID-19 or who are suspected positive from those who do not have the virus. COVID-19 positive inmates are commingled in wards with those who have tested negative.  This creates obvious opportunity for virus spread.

53.     Inmates with obvious COVID-19 symptoms are commingled in wards with those who do not have symptoms or who have tested negative.

54.     Inmates who have been exposed to COVID-19—who may have the virus or be asymptomatic spreaders of the virus—are commingled with inmates who have tested negative or who do not have the virus.

55.     As a result of Defendant's policies, on information and belief numerous inmates who were virus-free at intake are contracting the virus from their exposure to COVID-19-positive inmates inside the jail.

### c.   Failure to Quarantine New Intakes

56.     The jail fails to adequately quarantine new intakes into the jail and instead often places them in general population within days, exposing both these individuals as well as inmates already in the jail and causing them to become infected.

57.     New intakes are placed into housing wards of 70-80 other inmates within days and sometimes less, without the standard 14-day period of quarantine.

58.     This spreads infection both ways. New intakes who do not have the virus are placed in housing wards with COVID-19 positive inmates. These new intakes then become infected themselves and further spread the virus. Conversely, new intakes who might already have the virus

are placed in housing wards where they in turn expose and infect inmates to the virus, exacerbating and reintroducing virus spread within the jail.

59.     The jail also frequently moves people around from one ward to another, with some inmates having a new bunkmate or roommate nearly every day, spreading the virus throughout the jail and increasing the exposure to all incarcerated.

### d.  Failure to Identify and Protect Medically Vulnerable Inmates

60.     The jail fails to identify those medically vulnerable to death or serious illness from COVID-19 pursuant to guidelines issued by the CDC.[45] Those whom CDC deems "are" or "might be" medically vulnerable to serious illness or death from COVID-19 must take heightened precautions, and this list currently includes:

> a.  cancer; chronic kidney disease; chronic obstructive pulmonary disease; heart conditions; immunocompromised state from solid organ transplant; obesity (BMI of 30 or higher); severe obesity (BMI of 40 or higher); pregnancy; sickle cell disease; smoking; type 2 diabetes mellitus; asthma (moderate to severe); cerebrovascular disease; cystic fibrosis; hypertension or high blood pressure; immunocompromised state from blood or bone marrow transplant, immune deficiencies, HIV, use of corticosteroids, or use of other immune weakening medications; neurologic conditions such as dementia; liver disease; overweight

---

[45] CDC, *People with Certain Medical Conditions* (updated Dec. 1, 2020), https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html?CDC_AA_refVal=https%3A%2F%2Fwww.cdc.gov%2Fcoronavirus%2F2019-ncov%2Fneed-extra-precautions%2Fgroups-at-higher-risk.html.

(BMI of 25 or greater); pulmonary fibrosis; thalassemia; type 1 diabetes mellitus.[46]

    b. Older people are more likely to develop severe COVID-19 illness resulting in hospitalization or death.[47] Those age 50-64 are 4 times more likely to be hospitalized, and 30 times more likely to die from COVID-19, compared to a younger control group; those age 65-74 are 5 times more likely to be hospitalized, and 90 times more likely to die, compared to that same control group; and so on.[48] Therefore, Plaintiffs define Medically Vulnerable to include those age 55 and up.

61.    The above lists define the term Medically Vulnerable herein. The CDC stresses that the above medical conditions are not exhaustive and are continually modified as additional data and research develops. Individual assessments for medical vulnerabilities must be made to ascertain whether a particular medical condition, or combination of conditions in a given individual, creates heightened risk of mortality and serious illness to COVID-19.[49] In such cases, even if the condition or combination of conditions are not on the CDC list, the individual may be considered medically vulnerable and require the same heightened protections.[50]

62.    Because the jail fails even to identify the medically vulnerable, the jail also fails to protect these individuals from becoming infected, failing to separate them from COVID-19

---

[46] *Id.*

[47] CDC, *Older Adults* (updated Dec. 7, 2020), https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/older-adults.html.

[48] CDC, *People with Certain Medical Conditions*, *supra* note 43.

[49] *Id.*

[50] *Id.*

positive or suspected positive inmates or those who are asymptomatic spreaders, and failing to afford them adequate distancing.

63.     The jail also fails to identify and protect medically vulnerable inmates during the intake process. This immediately exposes new medically vulnerable inmates to infection both during intake as well as when they are placed in housing wards already plagued by infection.

### e.   Failure to Ensure Adequate Physical Distancing

64.     The jail fails to ensure inmates can maintain adequate physical distance from each other to mitigate the risk of becoming infected with COVID-19. As is by now familiar, CDC guidelines require at least 6 feet physical distance between persons to minimize spread.

65.     The El Paso County jail is a densely populated facility and the second largest jail in the state, with a population that has fluctuated from between approximately 900 people at its lowest, to over 1,200 throughout the pandemic. The current jail population is approximately 1,200. The jail population has increased since the COVID-19 outbreak at issue here in October-December of 2020.

66.     In this highly populous setting, a good portion of the inmates live in housing wards of approximately 70-80 people, and generally sleep on bunks in open bays with 8-10 other inmates (while fewer inmates are housed in cells). Within their bays, it is impossible for these 8-10 inmates to maintain physical distance. They sleep on bunks within a foot or two of others, and come into close daily contact through living together.

67.     Within the housing wards, these groups of 70-80 inmates commingle freely in common areas, and at seating areas, where it is impossible to maintain adequate physical distance.

68.     Inmates share toilet facilities, chairs, tables, and other common objects and utilities through which the virus may be spread. A housing ward of 70-80 inmates may share 6 or as few

as 2-3 toilets. Because such close quarters, as well as contaminated surfaces and fecal matter, facilitates the spread of infection, these conditions magnify the risk to Plaintiffs and class members. Given diarrhea and vomiting are symptoms of COVID-19, crowded use of few toilets makes the risk of infection even worse.

### f.   Failure to Evaluate, Monitor, and Treat COVID-19 Positive Inmates

69.   The jail fails to adequately evaluate, monitor, and treat inmates who are infected with COVID-19 and experiencing symptoms, physical suffering, and potentially long-lasting and even permanent injury.

70.   Plaintiffs and class members sick with COVID-19 are often not medically evaluated promptly or at all despite experiencing symptoms. The jail fails to medically evaluate the severity of their symptoms, fails to assess any underlying medical vulnerabilities which may increase risks, and fails to conduct an individualized assessment of the patient's needs.

71.   Sick inmates are inadequately monitored by medical staff. Monitoring is sporadic and unreliable if it happens at all. Sick inmates are left to suffer in their cells. The jail fails to conduct regular daily medical checks for those suffering with COVID-19. Some prisoners who are sick with COVID-19 have managed to sporadically obtain Tylenol or cough syrup to mitigate their symptoms, but delivery is erratic, unreliable, and many prisoners have been unable to obtain any medication at all.

72.   For people experiencing serious COVID-19 symptoms like difficulty breathing and debilitating chest pain, the jail fails to ensure they receive individualized evaluation and treatment according to their condition.

### g. Failure to Inform and Educate Inmates So that They Can Protect Themselves

73.     The jail fails to inform inmates of their COVID-19 test results in a timely manner, and sometimes not at all. Some inmates have been denied access to their test results despite repeated requests to staff.

74.     The jail fails to educate inmates on necessary precautions to prevent the spread of COVID-19 and mitigate its impact. For instance, the jail fails to ensure inmates are aware of the CDC list of pre-existing conditions that render people especially vulnerable if they contract COVID-19. It fails to ensure inmates are aware of the importance of mask-wearing or the purposes it serves. On information and belief, the jail even posted some information about COVID-19 in the jail but deliberately omitted mention of the importance of mask-wearing.

## F. Failure to Meet CDC Guidelines for Prevention of COVID-19 In Jails

75.     Defendant Elder fails to follow CDC guidelines on COVID-19 prevention in congregate settings like jails and prisons.

76.     The failure to ensure mask-wearing, as alleged herein, violates CDC guidance: "Masks are recommended as a simple barrier to help prevent respiratory droplets from traveling into the air and onto other people when the person wearing the mask coughs, sneezes, talks, or raises their voice. This is called source control. If everyone wears a mask in congregate settings, the risk of exposure to SARS-CoV-2 can be reduced."[51] The CDC further recommends that jails ensure sufficient stock of PPE including "cloth face mask[s] for source control." Though everyone should wear a mask, the CDC further reiterates that jails ensure those positive for COVID-19 wear

---

[51] CDC, *Interim Clinical for Detention Facilities*, *supra* note 38.

a mask to prevent spread. Defendant Elder has failed, and continues to fail, to meet these guidelines.

77.     The CDC also recommends strict isolation, quarantine, and cohorting protocols in order to reduce infection, including:

    a.  Medically isolating those confirmed COVID-19 positive into cohorts separated from others;

    b.  Medically isolating those suspected positive of COVID-19 from all other inmates pending test results;

    c.  Quarantining for at least 14 days new intakes into jails;

    d.  Quarantining those who were in close contact with a confirmed or suspected COVID-19 positive individual for 14 days, under close, daily medical monitoring;

    e.  Requiring mask-wearing at all times for those individuals quarantined as a cohort.[52]

78.     Defendant Elder fails to meet each of the above guidelines. For instance: rather than strictly quarantine those exposed to a suspected or confirmed positive, the jail has intermixed exposed and unexposed individuals, increasing spread; rather than cohort only those confirmed COVID-19 positive, the jail has intermixed suspected and confirmed COVID-19 positive individuals, increasing spread; rather than separate new intakes, the jail has placed them into general population within days, increasing spread.

_____

[52] *Id.*

**G. Defendant Elder Fails to Meet CDC Guidelines for Evaluation, Treatment, and Monitoring of those Positive for COVID-19 in Jails**

79.     Regarding clinical care of those infected, CDC guidelines for jails state that "facilities should ensure that incarcerated/detained individuals receive medical evaluation and treatment at the first signs of COVID-19 symptoms."[53] Jails must ensure an "initial medical evaluation" occurs, including an assessment for any underlying medical vulnerabilities.[54] Defendant Elder is failing to comply with this guideline, as those showing COVID-19 symptoms often wait days for evaluation and treatment and often are not evaluated or treated at all.

80.     CDC also requires that jails ensure that their staff providing care for those confirmed or suspected positive for COVID-19 follow the standard clinical guidance for the disease.[55] These clinical guidelines include the following:

a.   For mild to moderate presentation of symptoms, the decision whether to conduct inpatient or outpatient care "should be made on a case-by-case basis" depending on risk factors and the ability to self-isolate, and "risk factors for severe illness" require close monitoring for further intervention;

b.   For those suffering severe symptoms, hospitalization may be required.[56]

c.   The jail fails to comply with these CDC clinical guidelines.

81.     Sheriff Elder fails to cause individual treatment plans to be developed and followed for inmates who are COVID-19 positive or suspected of being COVID-19 positive and experiencing COVID-19 symptoms.

---

[53] *Id.*
[54] *Id.*
[55] *Id.*
[56] CDC, *Clinical Care Guidance*, https://www.cdc.gov/coronavirus/2019-ncov/hcp/clinical-guidance-management-patients.html.

82.     The CDC recommends compliance with the more detailed Coronavirus Disease 2019 (COVID-19) Treatment Guidelines (Treatment Guidelines) propounded and continually updated by the National Institute of Health (NIH).[57] Defendant Elder fails to provide clinical care that meets these CDC and NIH standards.

## IV.     CLASS ACTION ALLEGATIONS

83.     Plaintiffs bring this action pursuant to Rule 23 of the Federal Rules of Civil Procedures on behalf of themselves and a class of similarly situated individuals.

84.     All Plaintiffs seek to represent a class defined as all current and future persons held in custody at the El Paso County Jail.

85.     Plaintiffs also seek certification of three subclasses:

   a.   Plaintiffs Weikert, Lacey, Nelson, and Le Chiffre each seek to represent a subclass of all current and future persons held in pretrial detention at the El Paso County Jail (the "Pretrial Detention Subclass");

   b.   Plaintiff Hermanns and Trujillo seek to represent a subclass of all current and future persons confined in the El Paso County Jail in in connection with a criminal conviction the "Post-Conviction Subclass");

   c.   Plaintiffs Weikert, Hermanns, Lacey, Nelson, and Le Chiffre seek to represent a "Medically Vulnerable Subclass." The Medically Vulnerable Subclass is defined as persons who are Medically Vulnerable with respect to COVID-19 pursuant to current CDC guidelines.

---

[57] National Institute of Health, COVID-19 Treatment Guidelines, https://files.covid19treatmentguidelines.nih.gov/guidelines/covid19treatmentguidelines.pdf.

86.     The classes and subclasses are so numerous that joinder of all members is impracticable. The current jail population is approximately 1,200 persons. On information and belief, hundreds of persons in the jail are medically vulnerable. Moreover, on information and belief, the majority of persons held in the jail are pre-trial and are not being detained based on conviction of a crime, and at least one hundred persons are being held at the jail as a result of a criminal conviction.

87.     There are questions of law or fact common to the class. For example:

    a.   Whether Sheriff Elder is deliberately indifferent to the health and safety of persons confined in the jail with respect to the COVID-19 pandemic is a common question of fact.

    b.   Whether Sheriff Elder's deliberate indifference violates persons' rights under the state and federal constitutions is a common question of law.

    c.   Whether protective measures such as universal mask wearing, physical distancing, separating potentially infected inmates from others, and developing treatment plans for inmates sick with COVID-19 are minimum constitutional requirements during the course of a pandemic presents common issues of law and fact.

    d.   Whether it is necessary to meet minimum constitutional safeguards to provide enhanced safety protocols for medically vulnerable persons presents a common question of law and fact for the Medically Vulnerable Subclass.

88.     The claims of the representative parties are typical of the claims or defenses of the class. The Plaintiffs are all confined in El Paso County Jail and at risk of, or are suffering from, COVID-19.

89.     The representative parties will fairly and adequately protect the interests of the class. Each Plaintiff understands their duty as a representative party and they have engaged competent counsel to prosecute this action. Counsel for this action have experience litigating class action cases, and have no conflicts of interest that would preclude vigorous advocacy on behalf of the class.

90.     Certification of a class under Fed. R. Civ. P. 23(b)(2) is appropriate because Sheriff Elder has acted and refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole.

## V.       CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF

**Unconstitutional Conditions of Confinement**
(Fourteenth Amendment; 42 U.S.C. § 1983)
*Plaintiffs Weikert, Lacey, Nelson, Le Chiffre, and the Subclass of Pre-Trial Inmates*

91.     Plaintiffs hereby incorporate all other allegations of this Complaint.

92.     The Due Process Clause of the Fourteenth Amendment governs the treatment of pretrial detainees. Persons in pretrial custody are presumed innocent and therefore have greater protections from adverse government actions than persons convicted of crimes.

93.     The Due Process Clause requires Defendant Elder to protect pretrial detainees from a substantial risk of serious harm to their health and safety. It also requires Sheriff Elder to provide for pretrial detainees' serious medical needs.

94.     Defendant has made intentional decisions that result in the unsafe and dangerous conditions of confinement described in this complaint. Defendant has not taken reasonable available measures to abate or reduce the risk of serious harm from COVID-19. A reasonable

custodian under the circumstances would have understood the high degree of risk involved, and thus the adverse consequences of Defendant's actions and failures to act are obvious.

95.     Defendant knows and has known of the risks that COVID-19 poses to the Plaintiffs. Indeed, the risks are and have been obvious. Nevertheless, Defendant has disregarded and continues to disregard the substantial risk of serious harm to Plaintiffs from COVID-19.

96.     Sheriff Elder has subjected Plaintiffs and the Pretrial Detention Subclass to unsafe and dangerous conditions of confinement that place them at substantial risk of serious harm from COVID-19. Sheriff Elder has demonstrated both subjective and objective deliberate indifference to the risk that Plaintiffs will suffer sickness, serious injury to their health, or even death.

97.     As a result, Plaintiffs have suffered, and without this Court's intervention, will continue to suffer irreparable injury.

### SECOND CLAIM FOR RELIEF

**Unconstitutional Conditions of Confinement**
(Eighth Amendment; 42 U.S.C. § 1983)
*Plaintiff Hermanns, Trujillo, and the Subclass of Post-Conviction Inmates*

98.     Plaintiffs hereby incorporate all other paragraphs of this Complaint.

99.     The Eighth Amendment forbids "cruel and unusual punishment." Accordingly, the Constitution requires that Defendant protect incarcerated persons from a substantial risk of serious harm to their health and safety.

100.     The Eighth Amendment forbids deliberate indifference to incarcerated persons' serious medical needs.

101.     Defendant has shown and continues to show deliberate indifference to a substantial risk of serious harm to the Plaintiffs and the class, and deliberate indifference to their serious medical needs, in violation of the Eighth Amendment.

102.    COVID-19 infection poses a risk of serious harm, including death, to all incarcerated persons in the El Paso County Jail. Defendant has acted with deliberate indifference to the risks posed to Plaintiffs and the class from the presence and spread of COVID-19 at the jail.

103.    Defendant knows and has known of the risks that COVID-19 poses to Plaintiffs and the class. Indeed, the risks are and have been obvious. Nevertheless, Defendant has disregarded and continues to disregard the substantial risk of serious harm to Plaintiffs and the class from COVID-19.

104.    As a result, Plaintiffs and the class have suffered, and without this Court's intervention, will continue to suffer irreparable injury.

### THIRD CLAIM FOR RELIEF

**Unconstitutional Conditions of Confinement in Violation of the Colorado Constitution**
Colo. Const. Art. II, Sec. 25
*Due Process of Law*
*Plaintiffs Weikert, Lacey, Nelson, Le Chiffre, and the Subclass of Pre-trial Inmates*

105.    The Colorado Constitution, Article II, Section 25, provides: "No person shall be deprived of life, liberty or property, without due process of law."

106.    These rights are informed by the statutory obligation that persons "in custody shall be treated humanely and provided with adequate food, shelter, and, if required, medical treatment." C.R.S. § 16-3-401.

107.    The Due Process Clause of the Colorado Constitution governs the treatment of pretrial detainees. Persons in pretrial custody are presumed innocent and therefore have greater protections from adverse government actions than persons convicted of crimes.

108.     The Due Process Clause requires Defendant Elder to protect pretrial detainees from a substantial risk of serious harm to their health and safety. It also requires Sheriff Elder to provide for pretrial detainees' serious medical needs.

109.     Defendant has made intentional decisions that result in the unsafe and dangerous conditions of confinement described in this complaint. Defendant has not taken reasonable available measures to abate or reduce the risk of serious harm from COVID-19. A reasonable custodian under the circumstances would have understood the high degree of risk involved, and thus the adverse consequences of Defendant's actions and failures to act are obvious.

110.     Defendant knows and has known of the risks that COVID-19 poses to the Plaintiffs. Indeed, the risks are and have been obvious. Nevertheless, Defendant has disregarded and continues to disregard the substantial risk of serious harm to Plaintiffs from COVID-19.

111.     Sheriff Elder has subjected Plaintiffs and the Pretrial Detention Subclass to unsafe and dangerous conditions of confinement that place them at substantial risk of serious harm from COVID-19. Sheriff Elder has demonstrated both subjective and objective deliberate indifference to the risk that Plaintiffs will suffer sickness, serious injury to their health, or even death.

112.     As a result, Plaintiffs have suffered, and without this Court's intervention, will continue to suffer irreparable injury.

### FOURTH CLAIM FOR RELIEF

**Unconstitutional Conditions of Confinement in Violation of the Colorado Constitution**
Colo. Const. Art. II, Sec. 20
*Prohibition of Cruel and Unusual Punishment*
*Plaintiff Hermanns, Trujillo, and the Subclass of Post-conviction Inmates*

113.     The Colorado Constitution, Article II, Section 20 provides: "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted."

114.    These rights are informed by the statutory obligation that persons "in custody shall be treated humanely and provided with adequate food, shelter, and, if required, medical treatment." C.R.S. § 16-3-401.

115.    The Colorado Constitution forbids deliberate indifference to incarcerated persons' serious medical needs.

116.    Defendant has shown and continues to show deliberate indifference to a substantial risk of serious harm to the Plaintiffs and the class, and deliberate indifference to their serious medical needs, in violation of the Colorado Constitution.

117.    COVID-19 infection poses a risk of serious harm, including death, to all incarcerated persons in the El Paso County Jail. Defendant has acted with deliberate indifference to the risks posed to Plaintiffs and the class from the presence and spread of COVID-19 at the jail.

118.    Defendant knows and has known of the risks that COVID-19 poses to Plaintiffs and the class. Indeed, the risks are and have been obvious. Nevertheless, Defendant has disregarded and continues to disregard the substantial risk of serious harm to Plaintiffs and the class from COVID-19.

119.    As a result, Plaintiffs and the class have suffered, and without this Court's intervention, will continue to suffer irreparable injury.

## VI.    REQUEST FOR RELIEF

120.    Plaintiffs, for themselves and for the members of the proposed Class, respectfully request that the Court order the following:

1. Certification of this action as a Class Action;

2. A temporary restraining order, preliminary injunction, and permanent injunction requiring Defendant to implement the following policies:

a.  Inmates and staff must be required to wear masks at all times.  To allow inmates to wear masks at all times, each inmate must be issued at least two cloth masks, such that when one mask is being washed daily, another mask can be worn.  Alternatively, inmates may be issued disposable masks which are replaced at the frequency recommended by the mask manufacturer.

b.  COVID-19 positive and suspected COVID-19 positive inmates must be isolated from other inmates, with cohorting used sparingly for COVID-19 positive inmates, and no cohorting used for suspected COVID-19 positive inmates.

c.  Newly admitted inmates must be screened to determine if they are medically vulnerable, and all inmates arriving at the jail should be tested for COVID-19 upon arrival if possible.

d.  The jail should engage in regular prevalence testing to screen for COVID-19 outbreaks at the jail.

e.  Newly admitted inmates who do not test negative for COVID-19 upon arrival at the jail must be quarantined in a transition unit for at least 14 days prior to being moved to a general population unit in the jail.

f.  During the quarantine period for newly admitted inmates, the medically vulnerable newly admitted inmates must be placed in single cells to the maximum extent feasible to prevent exposure from other inmates of the transition unit.

g.  After leaving the transitional unit, medically vulnerable inmates should be housed and kept separate from other inmates to the maximum extent feasible, so that they do not come into contact with COVID-19 positive inmates.

h.  Routine cleaning practices for all hard-metal and other non-porous surfaces must be strictly followed, including for toilets, sinks, showers, tables, telephones, and other areas of the jail.  Inmates must be afforded access to cleaning supplies to wipe the surfaces down with cleaners or disinfecting wipes sufficient to eliminate the virus.

i.  Inmates must be afforded adequate supplies of soap for basic hygiene and hand-washing multiple times per day.

j.  Each COVID-19 positive inmate must be evaluated by medical personnel.  Symptomatic inmates must have individual treatment plans consistent with medical best practices.  Each COVID-positive inmate must be examined daily, with vital signs taken, to determine if their condition is worsening, and if changes are required for the inmate's treatment plan.

k.  Symptomatic inmates must be afforded treatment consistent with medical best practices, including access to pain relievers and other needed medication without undue delay.

l.  All inmates must be afforded ongoing access to clean drinking water from a fountain or other water faucet that does not require the inmate to drink from sinks used for handwashing.  Likewise, inmates require access to both hot and cold water so that they can have proper nutrition by using hot water for food preparation such as for soup packets.

    m.  All inmates must be provided accurate, up-to-date educational materials and information regarding controlling the spread of COVID-19.

3. A declaration that the jail's policies violate the Fourteenth Amendment rights to reasonable safety and to be free from punishment prior to conviction;

4. A declaration that the jail's policies violate the Eighth Amendment right against cruel and unusual punishment;

5. A declaration that the jail's policies violate the right under Article II Section 25 of the Colorado Constitution to reasonable safety and to be free from punishment prior to conviction;

6. A declaration that the jail's policies violate the right under Article II Section 20 of the Colorado Constitution against cruel and unusual punishment;

7. Attorney's fees and costs; and

8. Any further relief authorized by law this Court deems appropriate.

Dated: December 13, 2020


        Respectfully submitted,

        s/ *Daniel D. Williams*
        Daniel D. Williams
        HUTCHINSON BLACK AND COOK, LLC
        921 Walnut Street, Suite 200
        Boulder, Colorado 80302
        (303) 442-6514
        Williams@hbcboulder.com

        David G. Maxted
        MAXTED LAW LLC
        1543 Champa Street Suite 400
        Denver, CO 80202
        Phone: 720-717-0877
        Fax: 720-500-1251
        dave@maxtedlaw.com

Jamie Hughes Hubbard
STIMSON STANCIL LABRANCHE HUBBARD LLC
1652 Downing Street
Denver, CO 80218
Phone:  720.689.8909
Email:  hubbard@sslhlaw.com

Mark Silverstein
Sara Neel
Arielle Herzberg
Asma Kadri Keeler
Anna I. Kurtz
AMERICAN CIVIL LIBERTIES UNION FOUNDATION
OF COLORADO
303 E. 17th Avenue, Suite 350
Denver, Colorado 80203
(720) 402-3114
msilverstein@aclu-co.org
sneel@aclu-co.org
akeeler@aclu-co.org
aherzberg@aclu-co.org
akurtz@aclu-co.org

*Counsel for Plaintiffs and proposed counsel for
the putative class*